**MAINE STATE EMPLOYEES ASSOCIATION et al.**

v.

**The UNIVERSITY OF MAINE.**

Supreme Judicial Court of Maine.

Dec. 29, 1978.

---

John J. Finn (orally), Maine State Employees Ass'n, Augusta, for plaintiffs.

Bernstein, Shur, Sawyer & Nelson by George M. Shur (orally), Barnett I. Shur, Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

POMEROY, Justice.

When the University of Maine (the University) discontinued its voluntary checkoff previously afforded for union dues and insurance benefits, the Maine State Employees Association (MSEA) reacted by

(A) seeking declaratory and injunctive relief in the Superior Court;

(B) seeking preliminary injunction against the action taken.

The Superior Court

(1) denied the motion for preliminary injunction; and

(2) dismissed the complaint seeking declaratory and injunctive relief with prejudice.

This appeal resulted.

We deny the appeal.

Taking the facts alleged in the complaint as admitted, *Bramson v. Chester L. Jordan and Company,* Me., 379 A.2d 730 (1977); *Von Tiling v. City of Portland,* Me., 268 A.2d 888 (1970), it appears that since 1968, the University has *"provide[d] employees the opportunity to have regular deductions made from the payroll for dues, Savings Bonds and other approved purposes."* Among the approved checkoffs were deductions for Maine State Employees Association dues and Income Protection Plan premiums.[1]

At the time the University first inaugurated its checkoff policy, its employees were prohibited from bargaining collectively with their employer. The 107th Legislature,

---

1. In addition to Maine State Employees Association dues and Income Protection Plan premiums, the University provided, on a voluntary basis, checkoffs for the Maine State Retirement System, comprehensive group health, life and accidental death and dismemberment insurance premiums, the United States Government Savings Bond program, the United Fund, credit unions, the Second Century Fund, Maine State Group Health Plan premiums and Maine State Life Insurance premiums, among others.

however, removed that proscription when, in an effort to accord University employees rights commensurate with those of other public employees, it passed *"An Act Extending Collective Bargaining Rights to University of Maine Employees."* P.L.1975, c. 603.[2] MSEA, as well as other labor groups, immediately began organizing campaigns among the University's employees in preparation for the inevitable collective bargaining elections to take place following the Act's July 1, 1976 effective date.

Well before the Act became effective, although clearly with knowledge of its import, the University rescinded its policy of providing voluntary checkoff privileges for union dues and other union related benefits. Although not providing notice to MSEA prior to finalizing its decision, the University seasonably notified it in writing that, *"as of February 27, 1976, the University of Maine no longer will provide payroll deductions for union dues and other union benefits."* Unaffected by the decision were non-union related deductions.[3]

Obviously dissatisfied with the University's action, MSEA filed a complaint seeking declaratory and injunctive relief and application for temporary restraining order and preliminary injunction. A motion for a preliminary injunction was subsequently filed. A hearing was scheduled on February 24, 1976, at which time arguments were heard concerning the propriety of granting a preliminary injunction. Finding that MSEA had failed to show that harm necessary to warrant a preliminary injunction, the presiding Justice denied the motion.

On June 7, 1976, the United States Supreme Court rendered its decision in *City of Charlotte v. Local 660, International Association of Firefighters,* 426 U.S. 283, 96 S.Ct.

2036, 48 L.Ed.2d 636 (1976). Therein that Court held that a municipality's refusal to withhold union dues from the paychecks of its firefighters was based on a reasonable standard and therefore did not violate the Equal Protection Clause of the Fourteenth Amendment. Arguing the applicability of that decision to the case now before us, the University moved that MSEA's complaint be dismissed with prejudice, or, in the alternative, that the court grant the University summary judgment on all issues raised in the complaint. Apparently persuaded by that argument, the presiding Justice dismissed the complaint with prejudice.[4] It is that dismissal, in addition to the prior denial of its motion for preliminary injunction, that MSEA now brings before us.

MSEA presents four grounds upon which it argues that the Superior Court's decision should be reversed. First, it contends that the University's decision to terminate checkoff privileges only with regard to union related activities violates the Equal protection Clause of both the United States and Maine Constitutions.[5] Next, it argues that by refusing to allow union dues to be deducted from employees' paychecks, the University has effectively denied MSEA its First Amendment right to freedom of association. Third, it claims that the Superior Court Justice erred in not granting summary judgment in its favor. Finally, it argues that it was error for the Superior Court Justice to deny the motion for preliminary injunction. We shall address each issue in turn.

### I.

MSEA's first contention presents to us for the first time the question of whether an institution[6] which gratuitously

---

2. P.L.1975, c. 603 is now found in 26 M.R.S.A. §§ 1021 *et seq.*

3. *See* footnote one, *supra* for a list of checkoffs not affected by the University's new policy.

4. *See Local 1824 American Federation of State, County and Municipal Employees, Council 74, AFL–CIO v. University of Maine,* Civ. No. 76–57–SD (D.Me.1976), in which a complaint similar to that herein was dismissed with prejudice

on the grounds that there could be no basis for relief in light of *City of Charlotte v. Local 660, International Association of Firefighters, supra.*

5. U.S.Const. Amend. XIV, § 1; Me.Const. art. 1, § 6–A.

6. There is little doubt that the University's policy constitutes *"state action"* for purposes of Equal Protection analysis. *See* generally, *Rac-*

provided checkoff privileges for union dues and other union related activities, among a wide range of other checkoff privileges afforded other groups, violates either the individual union member's, or the union's, right to equal protection if it rescinds such a policy solely with regard to union-sponsored activities. MSEA does not argue, nor could it, that all discrimination based on classification results in a denial of equal protection. As numerous cases have pointed out, it is only invidious, arbitrary or unreasonable discrimination that is prohibited by law. *See Shapiro Brothers Shoe Co. v. Lewiston-Auburn Shoeworkers Protective Assoc.,* Me., 320 A.2d 247 (1974). Equally clear is the fact that MSEA's union status does not entitle it to special treatment under the Equal Protection Clause. The University's revised policy, therefore, must meet only a relatively relaxed standard of reasonableness in order to survive constitutional scrutiny. *See City of Charlotte v. Local 660, International Association of Firefighters, supra.*

The University presents two grounds upon which it argues the reasonableness of its decision to terminate union-related checkoff privileges. Primarily it argues that union dues checkoffs are a proper subject of collective bargaining, *see N. L. R. B. v. Reed and Prince Mfg. Co.,* 205 F.2d 131, 136 (1st Cir. 1953); *Strojny v. Rousakis,* 88 L.R.R.M. 2458 (S.D.Ga.1974); *cf., Edwards v. School District,* 78 L.R.R.M. 2618 (Ariz.App.1971), and, therefore, it should not, in light of University employees' newly acquired collective bargaining rights, be forced to forego now what should be reserved for the bargaining table. In the alternative, the University argues that its gratuitous collection of dues for the union imposes both an administrative and financial burden that should be borne by the union, not the University. In support of this position, the University notes that the union is reimbursed for similar services it renders to an insurance carrier. Because we find the first contention persuasive, we

need not decide the reasonableness of the second.

MSEA argues that the University's decision to terminate checkoff privileges for union dues and benefits was an arbitrary and standardless infringement upon their constitutional rights. We cannot agree. At the time the University first inaugurated its checkoff policy, University employees were prohibited from bargaining collectively with their employer. Against that background a decision was made to provide checkoff privileges to a wide ranging spectrum of interests, among which happened to be union dues and insurance premiums. In 1976, however, the Legislature altered the status quo. With the advent of P.L.1975, c. 603, University employees were, for the first time, afforded the right to bargain collectively. The natural consequence of such a change was the prospect that the University would be forced to negotiate with its employees regarding working conditions, wages, etc.[7] We cannot now say that when faced with such a situation, it was completely unreasonable for the University to refuse to provide gratuitously that which had become a proper subject of collective bargaining. *See N. L. R. B. v. Reed and Prince Mfg., supra.* As Justice McFadden stated in *American Federation of State, County, and Municipal Employees Union, AFL–CIO, Local No. 2557 v. Bailey,* Civ. No. 75–M–0021 (N.D.Ala.1975):

> If such a checkoff provision is included in the final contract, it is the product of the give and take of the bargaining process, perhaps with the union conceding a point in order to obtain the benefits of a checkoff.

*See also, Strojny v. Rousakis, supra,* in which Chief Justice Lawrence stated:

> Municipalities should have discretion in handling their labor relations and courts should not lightly diminish their bargaining power with a union in the matter of checkoff of union dues.

MSEA cannot prevail on its Equal Protection argument.

kin v. *University of Pennsylvania,* 386 F.Supp. 992, 1004–05 (E.D.Pa.1974).

7.  *See* 26 M.R.S.A. § 1026(1)(c) (Supp.1978).

## II.

◼ MSEA raises as its second point on appeal that the University's withdrawal of union payroll deductions violated MSEA's First Amendment right to freedom of association. Such an argument is premised on the theory that the organizational activities necessary to the creation and maintenance of a union are protected by the First Amendment. *See, N. A. A. C. P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Further, that by withdrawing the checkoff privilege, the University placed a chilling effect on MSEA's organizational capabilities in that the union was not in a position to collect dues directly from its members. In support of its argument, MSEA filed the affidavit of Joan C. Towle, Director of Administrative Services for MSEA. Therein, she stated that as a result of the University's decision, the union has lost approximately 200 of the 576 University employees who had previously taken advantage of the checkoff privilege.[8]

Although MSEA makes an impressive showing regarding the actual effect of the University's withdrawal of checkoff privileges, we do not find it sufficient to make out a denial of the right to associate freely. This precise issue was addressed by the New York Court of Appeals in *Bauch v. City of New York,* 21 N.Y.2d 599, 289 N.Y.S.2d 951, 237 N.E.2d 211 (1968), *cert. den.* 393 U.S. 834, 89 S.Ct. 108, 21 L.Ed.2d 105. Therein, the City of New York, by executive order, withdrew its previous policy of providing dues checkoffs for all municipal unions, and, in turn, only allowed the duly chosen bargaining union the privilege of having its dues checked-off. When faced with the argument MSEA now presents here, the Court stated:

*Nothing in the city's labor policy denies members of petitioners' union the right to meet, to speak, to publish, to proselytize and to collect dues by the means employed by thousands of organizations of all kinds, that do not have the benefit of*

*a dues check-off. Neither the First Amendment nor any other constitutional provision entitles them to the special aid of the city's collection and disbursing facilities.* 289 N.Y.S.2d at 956, 237 N.E.2d at 215.

We find such reasoning to be equally applicable to MSEA, especially in light of the testimony of David Carnevale, MSEA's executive director, which revealed that not only does his union's constitution provide for the direct collection of dues from its members, but also that several members took advantage of that option even when the University was offering a dues checkoff.

MSEA's reliance on such cases as *N. A. A. C. P. v. Alabama, supra,* is equally misplaced. In that case, the State of Alabama sought disclosure of the N. A. A. C. P.'s membership list. In reversing the Alabama Supreme Court's refusal to vacate a contempt order against the N. A. A. C. P. for failing to produce such lists, the United States Supreme Court said:

*[W]e think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of the exposure.* 357 U.S. at 462–63, 78 S.Ct. at 1172.

Such is clearly not the case here. The University has taken no affirmative action to dissuade members of MSEA from organizing. In fact, we have found no suggestion at all in the record that the University was motivated by any anti-union sentiment when it made its decision to alter its checkoff policy.

We, therefore, hold that MSEA has not been denied its freedom to associate as a result of the University's conduct.

---

**8.** Such figures contradict the testimony of David Carnevale, who testified at the hearing that the number of University employees joining the union had actually increased despite the new checkoff policy.

## III.

MSEA's final two points on appeal merit only brief discussion. MSEA contends that it would have been appropriate for the Superior Court Justice to render summary judgment against the University since there was no genuine issue as to any material fact and MSEA was entitled to judgment as a matter of law. Suffice it to say that our discussion above obviates the necessity for any detailed comments regarding the propriety of the trial Justice's refusal to grant MSEA summary judgment.

## IV.

Finally, MSEA argues that the Superior Court Justice erred in not granting their motion for a preliminary injunction. We find that our disposition of MSEA's equal protection and right to associate claims have rendered this issue moot. *See Combat v. Maine Milk Commission,* Me., 377 A.2d 95 (1977); *cf. Portland Water District v. Public Utilities Commission,* Me., 388 A.2d 91 (1978). We, therefore, have no occasion to reach the merits of MSEA's contention.

The entry must therefore be:

Appeal denied.

Judgment affirmed.

GODFREY, J., did not sit.